IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
_____

UNITED STATES OF AMERICA,

                             Plaintiff,

   v.

LONNIE WHITAKER,

                            Defendant.

REPORT AND
RECOMMENDATION

07-CR-123-C

_____

**REPORT**

Before the court in this gun possession case is defendant Lonnie Whitaker's motion to suppress the firearm charged against him.  Whitaker alleges that the police did not have reasonable suspicion to check for weapons in the interior of his car.  The government disagrees. For the reasons stated below I conclude that the weapons check was reasonable.  Therefore, this court should deny Whitaker's motion.

On October 10, 2007, this court held an evidentiary hearing.  Having heard and seen the witnesses testify, having made credibility determinations, and having considered all of the parties' exhibits, documents and affidavits, I find the following facts:

**FACTS**

On June 17, 2007, just before 8:00 p.m., someone called 911 to report a loud, profane argument in the parking lot of the Cub Foods grocery store on Verona Road in Madison.  The caller admitted he didn't get close, so he wasn't sure how many people were involved or what their genders were, but he said it was at least two people standing by a car, "two males, that I can see," later saying they were "pretty good-sized black guys."  A different citizen called in soon

after to report a man with a gun in the Cub Food parking lot.  This man identified himself as "Travis" calling from phone number 469-7710.  According to Travis, he was shopping at Cub when he saw his female cousin and her boyfriend "Lonnie" standing next to their cars arguing.  Lonnie was next to his silver car, the cousin was next to her blue van.  Travis reported that "we pulled up to ask was she all right and he pulled a gun on us!"  The cousin urged them to leave, so they did, then Travis called 911.  *Listen to* Gov. Exh. 1, (tape cassette of two 911 calls).

After the first call from the vague witness, the police dispatcher radioed for units in the area to investigate.  Police Officers Caleb Bedford, Chad Joswiak and Becky Overland, each patrolling separately, began driving there.  While they were en route, dispatch sounded the "alert tone," which is a heads-up of a call involving weapons.  Dispatch announced that a second caller had reported that a black man and a black woman were arguing in a silver vehicle in the Cub Foods parking lot and the man had displayed a handgun.  Dispatch did not convey the wealth of information provided by "Travis."  The officers continued to the scene.

Upon arrival, it was easy for the officers to locate a "silver" car parked near a van with some children in it, pretty much by themselves in the southwest corner of the parking lot.[1]  Officer Bedford arrived first and parked behind and slightly to the left of the car, a gray Chevy Impala.  He could see a black man in the driver's seat and a black woman in the front passenger seat.  Officer Bedford stepped out of his squad car and walked toward the driver's side of the Impala.  The driver stepped out of the Impala to face Officer Bedford.  About this time, Officer

---

[1] Sunset in Madison on June 17, 2007 was 8:39 p.m. *See* www.timeanddate.com.

2

Joswiak pulled up and parked his squad car to the right of Officer Bedford's and behind the Impala.  Officer Joswiak began walking toward the passenger side of the car.

Officer Bedford asked the man, soon identified as defendant Lonnie Whitaker, if he and the woman were having an argument.  Officer Bedford saw nothing in Whitaker's hands.  Officer Bedford asked Whitaker for permission to frisk him for a weapon.  Whitaker agreed.  Officer Bedford found nothing.

As Officer Joswiak approached the right side of the Impala, the woman passenger, soon identified as Keisha Marsh, stepped out of the car to face him. Officer Joswiak saw that she was crying and that her tears had dampened large circles on both shoulders of her shirt.  Officer Joswiak asked Marsh if she and Whitaker had arguing or fighting; she responded that they had been arguing.  Officer Joswiak asked Marsh whether everything was okay; she responded that everything was fine.  Officer Joswiak asked Marsh if there was any problem in the vehicle that involved a weapon; she responded that there was not.  Officer Joswiak asked Marsh if she had any weapons; she said no.  Officer Joswiak patted her down anyway but found no weapons.

Officer Joswiak announced to Marsh that he was going to do a weapons sweep of the passenger compartment of the Impala.  Marsh said nothing and maintained her position blocking entry.  Officer Joswiak physically guided Marsh out of the front doorway so that he could access the front passenger area.  Inside the armrest of the center console Officer Joswiak found and seized a black semiautomatic handgun.  Officer Bedford arrested Whitaker.

As part of the follow-up investigation, Officer Joswiak successfully contacted the first 911 caller by dialing the number listed in the 911 records.  Officer Joswiak also attempted to contact "Travis," the second 911 caller, by the same means but was unable to reach him directly,

3

although he reach a voice mail message for "Smokey."  Apparently a detective later was able to

locate and interview this second caller.

## ANALYSIS

Whitaker hinges the bulk of his argument on the application of *Florida v. J.L.*, 529 U.S.

266 (2000) to his case.  In *J.L.*, the Court held that an uncorroborated anonymous tip would

not justify the police stopping a person to frisk him for weapons.  But the question before the

Court in *J.L.* was whether the initial *stop* was justified:

> The requirement that an anonymous tip bear standard of indicia
> of reliability in order to justify a stop in no way diminishes a police
> officer's prerogative, in accord with *Terry*, to conduct a protective
> search of a person who has already been legitimately stopped.  We
> speak in today's decision only of cases in which the officer's
> authority to make the initial stop is at issue.

529 U.S. at 274.[2]

As the Seventh Circuit noted in *United States v. Brown*, 232 F.3d 589, 592 (7th Cir. 2000), there

can be two stages to a *Terry* stop: (1) the actual stop itself; and (2) a protective pat-down search.

The holding in *J.L.* is limited to Stage (1). Whitaker's challenge in this case is to the justification

for Stage (2).

That's because in this case, there was no "stop" by the police under any sense of the

word.  Both 911 callers reported that the two people arguing were standing next to a parked car.

When the police arrived, Whitaker and Marsh were sitting in the parked Impala.  Both officers

parked behind Whitaker without blocking his ability to drive away.  Whitaker and Marsh

---

[2] *"Terry"* is a reference to *Terry v. Ohio*, 392 U.S. 1 (1968).

voluntarily stepped out of the car before receiving any police command or request to do so. When Officer Bedford asked for permission to pat Whitaker down for weapons, Whitaker consented.  Therefore, up to this point this was a consensual police-citizen encounter that required no level of suspicion whatsoever from the police.  *See, e.g., United States v. Douglass*, 467 F.3d 621, 623-24 (7th Cir. 2006)("The Fourth Amendment is not triggered when law enforcement officers merely approach an individual in a public place and ask a few questions"). There was no "Stage (1)" stop, so *J.L.* is inapplicable.

The pertinent question is whether the police had reasonable suspicion that Whitaker had a gun in his possession, either on his person or in the passenger compartment of the car. Pursuant to *Terry*, 392 U.S. at 32, officers may search for weapons if specific and articulable facts support a suspicion that the suspect is armed and presents a danger to officers or to others. *United States v. Shoals*, 478 F.3d 850, 853 (7th Cir. 2007); *see also Brown*, 232 F.3d at 592.  The test is objective, not subjective, *see Brown*, 232 F.3d at 594.  "A protective pat-down search is appropriate only if the agents have at a minimum some articulable suspicion that the subject is concealing a weapon or poses a danger to the agents or others."  *United States v. Ford*, 333 F.3d 839, 843 (7th Cir. 2003).  Under such circumstances, it is appropriate for the police to conduct a protective search of the passenger compartment for a weapon.  *United States v. Arnold*, 388 F.3d 237, 239 (7th Cir. 2004).

Here, the officers had specific, articulable suspicions that Whitaker possessed a handgun: a man identifying himself as Marsh's cousin said that when he tried to intervene in their loud, very public spat, "Lonnie" waved him away with a handgun.  This by itself would be enough, but

the first caller provided some minimal corroboration.  Obviously, the first caller kept his distance

and didn't tarry, because he wasn't even sure how many people were involved or what their

genders were.  He thought it was a couple of pretty good-sized guys.  Even so, his report of a

loud, profane argument by the people near the silver car corroborated Travis's account of a loud

fight rather than the placid scene greeting the officers' arrival.

> Then there's the decision in *United States v. Drake*, 456 F.3d 771, (7th Cir. 2006):

> > [W]e recognize the particular duty of police officers to speedily respond to emergency situations reported by individuals through the 911 system.  . . .  Accordingly, an emergency 911 call is entitled to greater reliability than an anonymous tip concerning general criminality. . . . We therefore presume the reliability of an eyewitness 911 call reporting an emergency situation for purposes of establishing reasonable suspicion, particularly when the caller identifies herself.

> *Id*. at 775.

In *Drake,* the court found that the police had reasonable suspicion to justify a stop because when

the identified citizen witness called 911 to report an immediate threat to public safety, she

provided sufficient details to allow the officers to identify the suspects, and the police, upon

locating the vehicle described by the caller were not confronted with any reason to doubt her

report, so that the presumption of reliability remained intact.  456 F.3d at 775.[3]  As Whitaker

observes, it's not easy to reconcile *Drake* with *J.L.*, but as noted above, the holding of *J.L.* is

irrelevant to a Stage (2) weapons frisk that is at issue here.  *Drake* has value in bolstering this

---

[3] To almost the same effect, *see United States v. Hendrick*, 319 F.3d 993, 1002 n.2 (7th Cir. 2003) (tip from bus driver who did not give his name is not "anonymous" becuase his identity was easily ascertainable and the police knew his occupation, allowing the inference that he was a citizen legitimately reporting what he believed to be criminal activity).

court's finding that the officers' articulable suspicion that a handgun was present really was something more than an inchoate hunch.

Next, Whitaker attempts to impeach "Travis," on the ground that this wasn't his real name and the officers could not reach him at the phone number he provided. This is unavailing for several reasons.  First, the strength of the officers' articulable suspicion is measured at the time they acted. *Cf. Gower v. Verlcer*, 377 F.3d 661, 668 (7th Cir. 2004)(arrest case).  Second, a detective ultimately located and interview Travis, apparently confirming his eyewitness account of Whitaker brandishing a firearm.  After all, if he tells the police that Marsh is his cousin, he can't genuinely expect to remain anonymous forever.  Third, Travis provided extraordinary detail about the incident, in which he was the victim of Whitaker's wave-off with a handgun and his cousin was the victim of Whitaker's brow-beating.  Although the responding officers were not aware of these details, dispatch was.  Under the collective knowledge doctrine, this knowledge is imputed to the officers acting at dispatch's direction. *See Drake*, 456 F.3d at 774.

Whitaker challenges the application of the collective knowledge doctrine to this situation citing a case from the Second Circuit. *See United States v. Colon*, 250 F.3d 130 (2nd Cir. 2001). The court in *Colon* was concerned that the 911 employee who took the call was not a trained police officer and therefore was not qualified to make a probable cause determination upon which other officers would be justified relying. *Id*. at 135-36.  But the Seventh Circuit in *Drake* noted no such disconnect, assuming that a 911 dispatcher is part of the police "collective."  456 F.3d at 774.  If it were to matter, the information known to the dispatcher but not known to the responding officers was interstitial detail about Whitaker's possession of a gun.  No arcane

calculations known only to graduates of the police academy were necessary to deduce that the details provided by Travis made his report more credible.  He told a story, the point of which was that there was a man with a gun at the Cub parking lot in a silver car.  The responding officers were not required to hold off their frisk of the suspect and a sweep of his car's interior until the dispatcher shared with them the details that lent credibility to Travis's report.

Finally, and more generally, what the police encountered on the scene corroborated the reports of their two callers.  A silverish car was parked next to a van in the grocery parking lot.  A man named Lonnie was in the car with a woman.  They both admitted to an argument, and the woman, Marsh, was so upset that her shirt was soaked with tears.  When Officer Joswiak announced that he wanted to sweep the car's interior for weapons, Marsh declined to clear the way, requiring Officer Joswiak physically to guide her away from the door way.  *Cf. United States v. Adamson*, 441 F.3d 513, 521 (7th Cir. 2006) (one factor relevant to officers' reasonable suspicion that suspect was armed was his nervous clutching of a bundle that turned out to include a handgun wrapped in a pillowcase).  As the court concluded,

> [T]he fact-specific inquiry into the existence of reasonable suspicion must be undertaken with due regard to common sense and practicality. With that in mind, we have no trouble concluding, based on the facts before us, that the officers were legitimately concerned with their safety at the time they patted down Adamson and his effects.

441 F.3d at 521.

Notwithstanding Whitaker's vigorous protests, on these facts, it is easy to conclude that the officers had an articulable suspicion that there was a handgun on the scene.  Therefore, it was reasonable for them to check for weapons in the interior of Whitaker' car.

8

## RECOMMENDATION

Pursuant to 28 U.S.C. §636(b)(1)(B) and for the reasons stated above, I recommend that

this court deny defendant Lonnie Whitaker's motion to suppress evidence.

Entered this 5th day of November, 2007.

BY THE COURT:
/s/
STEPHEN L. CROCKER
Magistrate Judge

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN
120 N. Henry Street, Rm. 540
Post Office Box 591
Madison, Wisconsin  53701

Chambers of
STEPHEN L. CROCKER
U.S. Magistrate Judge

Telephone
(608) 264-5153

November 5, 2007

Rita Rumbelow
Assistant United States Attorney
P.O. Box 1585
Madison, WI 53703-1585

David Mandell
Mandell & Ginsberg
P.O. Box 2095
Madison, WI 53701

Re:    United States v. Lonnie Whitaker
       Case No. 07-CR-123-C

Dear Counsel:

The attached Report and Recommendation has been filed with the court by the United States Magistrate Judge.

The court will delay consideration of the Report in order to give the parties an opportunity to comment on the magistrate judge's recommendations.

In accordance with the provisions set forth in the newly-updated memorandum of the Clerk of Court for this district which is also enclosed, objections to any portion of the report may be raised by either party on or before November 13, 2007, by filing a memorandum with the court with a copy to opposing counsel.

If no memorandum is received by November 13, 2007, the court will proceed to consider the magistrate judge's Report and Recommendation.

Sincerely,

/s/ S. Vogel for
Connie A. Korth
Secretary to Magistrate Judge Crocker

Enclosures
cc:     Honorable Barbara B. Crabb, District Judge